WO

MDR

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Kenneth W. Reed,<br><br>Plaintiff,<br><br>v.<br><br>Trinity Services Group, Inc., et al.,<br><br>Defendants. | No. CV 21-00016-PHX-JAT (CDB)<br><br>**ORDER** |

On November 12, 2019, Plaintiff Kenneth W. Reed, who is confined in the Arizona State Prison Complex-Tucson in Tucson, Arizona, filed a Complaint in the Superior Court of Pima County, Arizona. Defendant Merriman subsequently filed a Notice of Removal.

Pending before the Court is Plaintiff's May 17, 2021 First Amended Complaint (Doc. 25). The Court will order Defendants Montaño, Merriman, Gaye, Muko, and Tuozzo to answer Count One of the First Amended Complaint, dismiss the remaining Defendants without prejudice, and dismiss as duplicative Count Two.

**I.     Statutory Screening of Prisoner Complaints**

The Court is required to screen complaints brought by prisoners seeking relief against a governmental entity or an officer or an employee of a governmental entity. 28 U.S.C. § 1915A(a). The Court must dismiss a complaint or portion thereof if a plaintiff has raised claims that are legally frivolous or malicious, that fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915A(b)(1)–(2).

TERMPSREF

A pleading must contain a "short and plain statement of the claim *showing* that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2) (emphasis added). While Rule 8 does not demand detailed factual allegations, "it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

"[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. Thus, although a plaintiff's specific factual allegations may be consistent with a constitutional claim, a court must assess whether there are other "more likely explanations" for a defendant's conduct. *Id.* at 681.

But as the United States Court of Appeals for the Ninth Circuit has instructed, courts must "continue to construe *pro se* filings liberally." *Hebbe v. Pliler*, 627 F.3d 338, 342 (9th Cir. 2010). A "complaint [filed by a pro se prisoner] 'must be held to less stringent standards than formal pleadings drafted by lawyers.'" *Id.* (quoting *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam)).

## II.     First Amended Complaint

In his two-count First Amended Complaint, Plaintiff seeks monetary damages and his costs and expenses from Defendants Trinity Services Group, Inc.; former Arizona Department of Corrections (ADC) Director Charles L. Ryan; Bureau of Administration Chief Hearing Officer Ruben Montaño, Food and Health Services Contracts Monitor David Merriman; Kitchen Operations Supervisors Jones and Barr; Correctional Programs Officer Gaye; Correctional Officers K. Muko, L. Valisto, P. Tuozzo, and Urrea; and Food Service Worker Does I through XI.

Plaintiff alleges Defendants subjected him to cruel and unusual punishment, in violation of the Eighth Amendment, regarding "[n]ecessities of life" (Count One) and "medical care" (Count Two). (Doc. 25 at 5, 16.)[1] In **Count One**, Plaintiff contends: (a) Defendants Ryan, Merriman, and Montaño knew or reasonably should have known that Defendant Trinity was not fulfilling its obligations to feed ADC inmates in compliance with the food service contract between ADC and Defendant Trinity, but failed to take corrective action; and (b) their failure to demand strict adherence to the contract was attributable to "their own disregard" or to their failure to "adequately train their subordinates, to whom they had delegated their authority to monitor Defendant Trinity's performance." (*Id*. at 14.) Plaintiff claims that as a result of Defendants' acts and omissions, he suffered twenty-five days of extreme and near-constant hunger, fatigue and lassitude, lapses in mental acuity, difficulty accomplishing ordinary tasks and participating in activities, worsening of his pre-existing dietary/gastrointestinal condition, and, "given his already emaciated condition, a perilous three-pound weight loss." (*Id*. at 14-16.) In **Count Two**, he claims Defendants' were deliberately indifferent to his serious medical needs when they failed to adhere to the medically prescribed dietary regime. (*Id*. at 16.)

Plaintiff's two counts are based on the same factual allegations:

### A.     Background Allegations

Plaintiff claims Defendant Ryan, as the "final policymaker for the State of Arizona regarding the matter in which [the State's] prisoners are kept and the conditions under which they are confined," entered into a contract with Defendant Trinity to "procure foodstuffs and prepare meals" to feed ADC inmates. (*Id*. at 5.) Defendant Trinity agreed to (a) provide adequate daily sustenance to ADC inmates (b) comply with orders and directives from ADC's healthcare contractor's providers to provide special "Restricted Diets" to inmates who required them due to medical conditions; and (c) comply with ADC

---

[1] The citation refers to the document and page number generated by the Court's Case Management/Electronic Case Filing system.

regulations and policies, including ADC's Department Order 912, Food Service System Technical Manual, Restricted Diets Manual, and Restricted Diets Menus. (*Id*. at 5-6.)

Plaintiff asserts Defendant Ryan formulated, promulgated, and implemented ADC's Department Order 912 and Food Service System Technical Manual to ensure Defendant Trinity's compliance with the food service contract. (*Id*. at 6.) In these documents, Defendant Ryan delegated to wardens, deputy wardens, facility administrators, and food service contract liaisons "the responsibility and his full authority for monitoring and, whenever necessary, for compelling Defendant Trinity's compliance" with the food service contract. (*Id.*) In turn, the wardens, deputy wardens, and facility administrators delegated their responsibility for monitoring Defendant Trinity's compliance "at mealtimes" to "their subordinates, most usually corrections officers," who are responsible for ensuring meals delivered to inmates are "fully compliant with menu and food service specifications." (*Id*.)

Plaintiff claims that in accordance with unwritten ADC protocol, an inmate must immediately notify the supervising staff member of "any discrepancy regarding the correctness of a meal" and the staff member must return the entire meal to the food service worker for correction or replacement. (*Id*.) An inmate's "acceptance of an uncorrected meal constitutes that inmate's irrevocable abandonment of any objection he or she had, or might have asserted, regarding its shortcomings." (*Id*.)

Plaintiff alleges Defendant Merriman was Defendant Ryan's liaison to monitor Defendant Trinity's performance at ASPC-Florence and he could "act with Defendant Ryan's full powers and authority" to enforce the food service contract. (*Id.* at 7.) He claims Defendant Montaño was Defendant Ryan's agent to monitor Defendant Trinity's performance at the ASPC-Florence's Central Unit and he could, either on his own or in concert with Defendant Merriman, "act with Defendant Ryan's full powers and authority . . . to demand strict adherence" to the contract and to require correction of all discovered deficiencies. (*Id*.)

. . . .

. . . .

### B. Plaintiff's Restricted Diet Order

Plaintiff alleges that on June 7, 2018, while he was confined in ASPC-Florence's East Unit, a medical provider, in an effort to stop Plaintiff's weight loss from an undiagnosed dietary/gastrointestinal disorder, issued a Restricted Diet Order, which required Plaintiff to receive an enhanced-calorie Wasting Syndrome Diet, a twice-daily liquid nutritional supplement, and snacks in the morning, at mid-day, and at bedtime. (*Id*.) When he was receiving this Restricted Diet Order at the East Unit, Plaintiff had "no complaint worthy of note" regarding meal service, and the occasional food service discrepancies were corrected in accordance with the "established meal service protocol." (*Id*.)

Plaintiff claims that at an August 8, 2018 weight check, his weight had declined to 112 pounds, which corresponded to a Body Mass Index (BMI) of 16.54.[2] (*Id*.) The following day, a regional medical director submitted an emergency transfer order for Plaintiff to be transferred to one of ADC's infirmaries. (*Id*.) On August 10, 2018, Plaintiff was moved to an infirmary in ASPC-Florence's Central Unit. (*Id*.) Plaintiff alleges that when he was discharged from the infirmary on September 2, 2018, his weight was 109 pounds, which corresponded to the BMI of 16.09. (*Id*. at 13.)

### C. Meals in the Infirmary

Plaintiff claims that during the twenty-five days he was in the infirmary, he was not fed eleven meals and, on two occasions, was not fed for twenty-four hours or longer. (*Id*. at 14.)

Plaintiff contends the thirteen meals he received at the infirmary between August 10, 2018, and breakfast on August 15, 2018, did not fully comply with his medically prescribed Restricted Diet Order, ADC's Restricted Diets Manual, or the applicable Restricted Diets Menu (hereinafter, a "noncompliant meal"). (*Id*. at 7.) He reported the

---

[2] Plaintiff alleges the United States Institutes for Health, the United States Centers for Disease Control and Prevention, and the United Nations World Health Organization recognize a BMI under 18.5 as "underweight" and a BMI of 16.00 as "severely underweight." (*Id*. at 7, 14.)

**TERMPSREF**

- 5 -

discrepancies to the officers conducting meal service. (*Id.*) For eight of the meals, the officers corrected the deficiencies by giving Plaintiff extra food from unclaimed meals. (*Id.*) As a result, the deficiencies were not reported to supervisory staff in the kitchen or to the food service workers, and, therefore, no corrective actions were taken to prevent the reoccurrence of discrepancies. (*Id.*) For the other five meals, the officers "supposedly 'called the kitchen'" to have the food service workers correct the deficiencies, but the food service workers corrected only one meal. (*Id.* at 7-8.) Plaintiff alleges, therefore, that on the other four occasions, either the officers "lied" to Plaintiff about calling the kitchen or the food service workers "simply chose to ignore the[] problems reported." (*Id.* at 8.) He claims he was "duped into accepting those four incorrectly prepared meals on empty promises of their being soon corrected." (*Id.*)

Plaintiff alleges that at noon on August 15, 2018, he spoke with a supervisory staff member and informed him that the thirteen meals were noncompliant meals. (*Id.*) The supervisory staff member "promised to 'mention' the Plaintiff's concerns to 'kitchen staff,'" but "roundly admonished" Plaintiff for failing to follow established protocol—immediately reporting discrepancies to the officer conducting meal service, who then became responsible for returning the entire meal to Defendant Trinity's food service workers for correction and, if the meal was not corrected or replaced, for preparing an information report documenting Defendant Trinity's failure to adhere to the contract. (*Id.*)

Plaintiff asserts that in addition to the eleven noncompliant meals specifically discussed below, and for which he followed the protocol, many other meals were noncompliant "to a lesser degree." (*Id.* at 14.) He contends his failure to follow protocol regarding these other noncompliant meals is "evidence of the coercive effect hunger had upon him and of his avoidance of the risk of his not being fed again and again and again." (*Id.*)

**1.    Lunch on August 15, 2018**

Defendant Doe 1 prepared a meal for Defendant Muko to serve Plaintiff. (*Id.* at 8.) When Defendant Muko presented the noncompliant meal to Plaintiff, Plaintiff described

how it was noncompliant, refused to accept it, and requested it be corrected or replaced. (*Id*.) Defendant Muko initially "attempted to bully" Plaintiff into accepting the meal, but relented and called the kitchen to report Plaintiff's complaint. (*Id*.)

Defendant Doe 1 eventually prepared and sent a different meal. (*Id*.) That meal was also noncompliant, and Plaintiff refused to accept it and requested Defendant Muko report the discrepancies to Defendant Doe 1 and request a corrected or replacement meal. (*Id*.) Defendant Muko again tried to bully Plaintiff into accepting the meal, but Plaintiff insisted Defendant Muko notify Defendant Doe 1 of the deficiencies and request a corrected or replacement meal. (*Id*.) Either Defendant Muko never reported the deficiencies to Defendant Doe 1 or Defendant Doe 1 chose not to take any corrective action; Plaintiff never received a corrected or replacement meal and, therefore, had nothing to eat for the remainder of the afternoon. (*Id*. at 8-9.)

### 2. Dinner on August 15, 2018

Defendant Doe II prepared a noncompliant meal for Defendant Valisto to serve Plaintiff. (*Id*. at 9.) When Defendant Valisto presented the meal to Plaintiff, Plaintiff described how it was noncompliant, refused to accept it, and requested it be corrected or replaced. (*Id*.) Either Defendant Valisto never contacted Defendant Doe II or Defendant Doe II chose not to take any corrective action; Plaintiff never received a replacement or corrected meal and, therefore, had nothing to eat for the remainder of the day. (*Id*.)

### 3. Breakfast on August 16, 2018

Defendant Doe III prepared a meal for Defendant Muko to serve Plaintiff. (*Id*.) When Defendant Muko presented the noncompliant meal to Plaintiff, Plaintiff described how it was noncompliant, refused to accept it, and requested it be corrected or replaced. (*Id*.) Either Defendant Muko never contacted Defendant Doe III or Defendant Doe III chose not to take any corrective action; Plaintiff never received a replacement or corrected meal and, therefore, had nothing to eat throughout the morning. (*Id*.)

. . . .

. . . .

### 4.     Breakfast on August 17, 2018

Defendant Doe IV prepared a meal for Defendant Muko to serve to Plaintiff. (*Id*.) When Defendant Muko presented the noncompliant meal to Plaintiff, Plaintiff described how it was noncompliant, refused to accept it, and requested it be corrected or replaced. (*Id*.) Defendant Muko tried to bully Plaintiff into accepting the meal and, although he admitted he had never seen the applicable Restricted Diets Menu or the Restricted Diets Manual, claimed the meal was "fully compliant with 'food service policy,'" the Restricted Diets Menu, and the Manual. (*Id*. at 9-10.)

Plaintiff continued to refuse the noncompliant meal and insisted it be corrected or replaced, but Defendant Muko "hotly refused to call anyone in the kitchen about the Plaintiff's complaint" and made an "implied threat of disciplinary action" when he told Plaintiff that he would be "summoning his supervisor to address the Plaintiff's uncooperative behavior." (*Id*. at 10.) However, no supervisor ever came to talk to Plaintiff, so he was unable to inform supervisory staff that he had not been fed breakfast because of Defendant Muko's bullying and refusal to notify Defendant Doe IV that the breakfast was noncompliant. (*Id*.) Defendant Muko did not report the deficiencies to Defendant Doe IV, and Plaintiff had nothing to eat that morning. (*Id*.)

### 5.     Lunch on August 17, 2018

Defendant Doe V prepared a meal for Defendant Muko to serve Plaintiff. (*Id*.) When Defendant Muko presented the noncompliant meal to Plaintiff, Plaintiff described how it was noncompliant, refused to accept it, and requested it be corrected or replaced. (*Id*.) Defendant Muko tried to bully Plaintiff into accepting the meal and insisted it fully complied with food service policy. (*Id*.) Plaintiff refused to accept the noncompliant meal and insisted it be corrected or replaced. (*Id*.) Either Defendant Muko never contacted Defendant Doe V or Defendant Doe V chose not to take any corrective action; Plaintiff never received a replacement or corrected meal and, therefore, had nothing to eat throughout the afternoon. (*Id*.)

. . . .

### 6. Brunch on August 18, 2018

Defendant Doe VI prepared a meal for Defendant Gaye to serve Plaintiff. (*Id.*) When Defendant Gaye presented the noncompliant meal to Plaintiff, Plaintiff described how it was noncompliant, refused to accept it, and requested it be replaced or corrected. (*Id.*) Defendant Gaye "unhesitatingly lied" to Plaintiff and told Plaintiff that he had "already spoken to kitchen staff about the wrongness of that meal." (*Id.*) Defendant Gaye did not identify who he spoke to or "how he could have known what its discrepancies were before the Plaintiff just mentioned them." (*Id.*)

Defendant Gaye tried to bully Plaintiff into accepting the meal, told Plaintiff "meal service is a 'take it or leave it proposition,'" and refused to call the kitchen about a problem "he attributed to the Plaintiff's imagination." (*Id.*) Plaintiff continued to refuse the noncompliant meal and insisted Defendant Gaye notify Defendant Doe VI so Defendant Doe VI could correct the meal. (*Id.*) A short while later, Defendant Gaye "claimed to have called the kitchen" and spoke with Defendant Doe VI, who "disclaimed that this morning's brunch was incorrectly prepared." (*Id.* at 10-11.)

Defendant Gaye subsequently delivered a completely different meal, which was a meal that was served to general population inmates and was not a special diet meal. (*Id.* at 11.) Plaintiff returned the meal to Defendant Gaye, described how it was noncompliant, and insisted Defendant Gaye return it to the kitchen so Defendant Doe VI could examine it, verify what was wrong with it, and either correct or replace it. (*Id.*) Either Defendant Gaye never contacted Defendant Doe VI or Defendant Doe VI chose not to take any corrective action; Plaintiff never received a replacement or corrected meal and, therefore, had nothing to eat until dinner. (*Id.*)

### 7. Brunch on August 19, 2018

Defendant Doe VII prepared a meal for Defendant Tuozzo to serve to Plaintiff; the meal was a Controlled Protein Diet meal, rather than a Wasting Syndrome Diet meal. (*Id.*) When Defendant Tuozzo presented the noncompliant meal to Plaintiff, Plaintiff described how it was noncompliant, refused to accept it, and requested it be replaced. (*Id.*) Defendant

Tuozzo initially tried to persuade Plaintiff to accept the meal, but then called the kitchen. (*Id.*) Defendant Tuozzo claimed he spoke with Defendant Barr, who was supposedly going to retrieve the meal and verify that it did not comply with Plaintiff's Restricted Diet Order. (*Id.*)

Throughout the morning and early afternoon, Plaintiff made numerous inquiries about Defendant Barr having not shown up and requested that Defendant Tuozzo call the kitchen again and speak with Defendant Doe VII, but Defendant Tuozzo refused to call the kitchen again and continued to reassure Plaintiff that Defendant Barr was coming. (*Id.*) Even after he learned that Defendant Barr either had left work early or had been "posted to other duties," Defendant Tuozzo would not call the kitchen again to speak to Defendant Doe VII. (*Id.*) Defendant Tuozzo told Plaintiff to address the problem with the officer on the next shift, who was going to replace Defendant Tuozzo, because that officer was "more knowledgeable about kitchen operations and more experienced with resolving food service problems." (*Id.*) However, when Plaintiff talked to that officer, the officer claimed that Defendant Tuozzo had not briefed him about the food issue, there was no mention of the issue in the Correctional Service Log, and he could not locate the Controlled Protein Diet meal Defendant Tuozzo had taken to his post to hold until Defendant Barr arrived. (*Id.*) Consequently, Plaintiff had nothing to eat until dinner. (*Id.*)

### 8. Lunch on August 22, 2018

Defendant Doe VIII prepared a meal for Defendant Tuozzo to serve Plaintiff. (*Id.* at 12.) When Defendant Tuozzo presented the noncompliant meal to Plaintiff, Plaintiff described how it was noncompliant, refused to accept it, and requested it be replaced or corrected. (*Id.*) Either Defendant Tuozzo never contacted Defendant Doe VIII or Defendant Doe VIII chose not to take any corrective action; Plaintiff never received a corrected or replacement meal and, therefore, had nothing to eat during the afternoon. (*Id.*)

### 9. Dinner on August 25, 2018

Defendant Doe IX prepared a meal for a nonparty to serve Plaintiff. (*Id.*) When the nonparty presented the noncompliant meal to Plaintiff, Plaintiff described how it was

noncompliant, refused to accept it, and requested it be replaced or corrected. (*Id.*) The nonparty confirmed the meal had been incorrectly prepared, returned it to the kitchen, and tried to call Defendant Doe IX. (*Id.*) However, Defendant Jones "intercepted" the call, refused to let the nonparty talk directly to Defendant Doe IX, and "flatly denied that anything was wrong with the meal" because "the Central Unit was a restricted-movement, maximum custody facility where . . . Defendant Montaño[] had directed Defendant Trinity to reduce portion sizes for all meals being served." (*Id.*) Because the nonparty had already returned the noncompliant meal to the kitchen, had been prevented from speaking directly to Defendant Doe IX, and had not been given a replacement meal, Plaintiff went without food until breakfast the following morning. (*Id.* at 12-13.)

### 10. Lunch on August 29, 2018

Defendant Doe X prepared a meal for Defendant Urrea to serve Plaintiff. (*Id.* at 13.) When Defendant Urrea presented the noncompliant meal to Plaintiff, Plaintiff described how it was noncompliant, refused to accept it, and requested it be replaced or corrected. (*Id.*) Either Defendant Urrea never contacted Defendant Doe X or Defendant Doe X chose not to take any corrective action; Plaintiff never received a corrected or replacement meal and, therefore, had nothing to eat during the afternoon. (*Id.*)

### 11. Breakfast on August 31, 2018

Defendant Doe XI prepared a meal for Defendant Muko to serve Plaintiff. (*Id.*) When Defendant Muko presented the noncompliant meal to Plaintiff, Plaintiff described how it was noncompliant, refused to accept it, and requested it be replaced or corrected. (*Id.*) Defendant Muko "flatly refused" to call Defendant XI or anyone else to report the discrepancies. (*Id.*) Plaintiff did not receive any food that morning because his meal was returned to the kitchen "without any request for corrective action" and, therefore, no corrected or replacement meal was provided. (*Id.*)

. . . .

. . . .

. . . .

**TERMPSREF**

- 11 -

### D. Inmate Letters

#### 1. Defendant Montaño

On August 16, 24, and 25, and September 2, 2018, Plaintiff sent inmate letters to Defendant Montaño regarding the food service discrepancies and the eleven meals he had not received because no corrective action had been taken: the August 16 inmate letter informed Defendant Montaño about the three meals on August 15-16; the August 24 inmate letter informed Defendant Montaño about the discrepancies in the five meals on August 17-24; the August 25 inmate letter informed Defendant Montaño about dinner that day; the September 2 inmate letter informed Defendant Montaño about the two meals on August 29 and 31. (*Id*. at 9, 12-13.) Plaintiff contends Defendant Montaño did not respond to any of the letters and did not take any corrective action. (*Id*.)

#### 2. Defendant Merriman

On August 24, 2018, Plaintiff sent an inmate letter to Defendant Merriman informing him about the food service problems on August 15-22 and explaining that he had not received eight meals. (*Id*. at 12.) On August 25, 2018, he sent an inmate letter to Defendant Merriman informing him about the food service problem that day and explaining that he had not received dinner because no corrective action had been taken. (*Id*. at 13.) On September 2, 2018, Plaintiff sent an inmate letter to Defendant Merriman informing him about the food service discrepancies on August 29 and 31, and explaining that he had not received those two meals because no corrective action had been taken. (*Id*.) Plaintiff asserts Defendant Merriman did not respond to any of the letters and did not take any corrective action. (*Id*. at 12-13.)

### III. Claims for Which an Answer Will be Required

Liberally construed, Plaintiff has stated deliberate indifference claims against Defendants Montaño, Merriman, Gaye, Muko, and Tuozzo. The Court will require these Defendants to answer Count One of the First Amended Complaint. The Court will dismiss Count Two because it is essentially duplicative of the allegations in Count One.

. . . .

### IV.     Failure to State a Claim

Although pro se pleadings are liberally construed, *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972), conclusory and vague allegations will not support a cause of action. *Ivey v. Bd. of Regents*, 673 F.2d 266, 268 (9th Cir. 1982). Further, a liberal interpretation of a civil rights complaint may not supply essential elements of the claim that were not initially pled. *Id.*

To state a valid claim under § 1983, plaintiffs must allege that they suffered a specific injury as a result of specific conduct of a defendant and show an affirmative link between the injury and the conduct of that defendant. *See Rizzo v. Goode*, 423 U.S. 362, 371-72, 377 (1976). There is no respondeat superior liability under § 1983, and therefore, a defendant's position as the supervisor of persons who allegedly violated Plaintiff's constitutional rights does not impose liability. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978); *Hamilton v. Endell*, 981 F.2d 1062, 1067 (9th Cir. 1992); *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). "Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. "A plaintiff must allege facts, not simply conclusions, that show that an individual was personally involved in the deprivation of his civil rights." *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998).

To state an Eighth Amendment conditions-of-confinement claim, plaintiffs must meet a two-part test. "First, the alleged constitutional deprivation must be, objectively, sufficiently serious" such that the "official's act or omission must result in the denial of the minimal civilized measure of life's necessities." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal quotations omitted). Second, the prison official must have a "sufficiently culpable state of mind," i.e., he must act with "deliberate indifference to inmate health or safety." *Id.* (internal quotations omitted). Deliberate indifference is a higher standard than negligence or lack of ordinary due care for the prisoner's safety. *Id.* at 835. In defining "deliberate indifference" in this context, the Supreme Court has imposed a subjective test:

"the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, *and* he must also draw the inference." *Id.* at 837 (emphasis added).

### A. Defendant Trinity

To state a claim under § 1983 against a private entity performing a traditional public function, such as providing meals to prisoners, a plaintiff must allege facts to support that his constitutional rights were violated as a result of a policy, decision, or custom promulgated or endorsed by the private entity. *See Tsao v. Desert Palace, Inc*., 698 F.3d 1128, 1138-39 (9th Cir. 2012); *Buckner v. Toro*, 116 F.3d 450, 452 (11th Cir. 1997) (per curiam). A plaintiff must allege the specific policy or custom and how it violated his constitutional rights. A private entity is not liable merely because it employs persons who allegedly violated a plaintiff's constitutional rights. *See Tsao*, 698 F.3d at 1139; *Buckner*, 116 F.3d at 452.

Plaintiff does not allege that any of the conduct described in the First Amended Complaint was the result of a specific policy or custom of Defendant Trinity. To the contrary, it appears that Defendant Trinity consistently provided Plaintiff with the Restricted Diet Order when Plaintiff was confined at the East Unit and that Plaintiff did not receive the Restricted Diet Order at the Central Unit because Defendant Montaño "directed Defendant Trinity to reduce portion sizes for all meals being served" at the restricted-movement unit. Thus, the Court will dismiss without prejudice Defendant Trinity.

### B. Failure to Train

To state a claim based on a failure to train or supervise, a plaintiff must allege facts to support that the alleged failure amounted to deliberate indifference. *Canell v. Lightner*, 143 F.3d 1210, 1213 (9th Cir. 1998). A plaintiff must allege facts to support that not only was particular training or supervision inadequate, but also that such inadequacy was the result of "a 'deliberate' or 'conscious' choice" on the part of the defendant. *Id.* at 1213-14; *see Clement v. Gomez,* 298 F.3d 898, 905 (9th Cir. 2002) (a plaintiff must allege facts

to support that "in light of the duties assigned to specific officers or employees, the need for more or different training is obvious, and the inadequacy so likely to result in violations of constitutional rights, that the policy[]makers . . . can reasonably be said to have been deliberately indifferent to the need." (quoting *City of Canton v. Harris*, 489 U.S. 378, 390 (1989))). A plaintiff must also show a "sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Redman v. County of San Diego*, 942 F.2d 1435, 1446 (9th Cir. 1991) (citations omitted).

Plaintiff alleges Defendants Ryan, Merriman, and Montaño's failure to demand Defendant Trinity's strict adherence to the food service contract stemmed from their failure to adequately train their subordinates, to whom they had delegated their authority to monitor Defendant Trinity's compliance with the contract. Plaintiff has failed to make any allegations regarding the training actually provided or how those inadequacies led to his injuries. Plaintiff's allegations are too vague and conclusory to state a failure-to-train claim against Defendants Ryan, Merriman, and Montaño. Thus, the Court will dismiss this claim.

### C.     Defendant Ryan

Plaintiff claims Defendant Ryan knew or should have known that Defendant Trinity was not fulfilling its obligation to feed ADC inmates in compliance with the food service contract and his failure to demand strict compliance with the contract was attributable to his "own disregard." However, based on Plaintiff's allegations, any noncompliance with the contract, at least regarding Plaintiff, was limited to the twenty-five days when Plaintiff was confined in the Central Unit. Plaintiff has alleged no facts to suggest that Defendant Ryan was aware that Defendant Trinity was not complying with the contract during this time period or what would have made him aware of this. Absent more, Plaintiff's allegations are too vague and conclusory to state a claim against Defendant Ryan regarding Defendant Trinity's failure to comply with the food service contract. The Court, therefore, will dismiss without prejudice this claim against Defendant Ryan.

. . . .

. . . .

TERMPSREF

**D.     Defendant Jones**

Plaintiff alleges that on August 25, 2018, Defendant Jones "intercepted" a nonparty correctional officer's telephone call to Defendant Doe IX, did not allow the nonparty to talk directly to Defendant IX; and denied that there was anything wrong with the meal because Defendant Montaño had "directed Trinity to reduce portion sizes for all meals being served" at the restricted-movement unit.  Plaintiff does not allege any facts suggesting Defendant Jones was acting with deliberate indifference to Plaintiff's health or safety.  Thus, the Court will dismiss without prejudice Plaintiff's claim against Defendant Jones.

**E.     Defendant Barr**

Plaintiff contends Defendant Barr was supposed to retrieve the noncompliant August 19 brunch and verify that it did not comply with Plaintiff's Restricted Diet Order, but did not do so because he either left work early or had been "posted to other duties." Plaintiff's allegations, at best, suggest that Defendant Barr may have been negligent in failing to retrieve the lunch.  But negligence does not constitute deliberate indifference. *Farmer*, 511 U.S. at 835.  Therefore, the Court will dismiss without prejudice Plaintiff's claim against Defendant Barr.

**F.     Defendants Does I through XI**

As to each individual Doe Defendant, Plaintiff alleges the individual prepared a single noncompliant meal and, if the deficiency was actually reported to the individual by a correctional officer, chose not to take corrective action and provide a corrected or replacement meal.  Plaintiff's allegations do not support a conclusion that any Doe Defendant acted with deliberate indifference to Plaintiff's health or safety; it appears each Doe Defendant prepared the meal and did not take corrective action because Defendant Trinity had been instructed by an ADC official to reduce portion sizes of meals served at the Central Unit.  Thus, the Court will dismiss without prejudice Defendants Does I through XI.

. . . .

**G.     Defendants Valisto and Urrea**

At most, Plaintiff alleges Defendant Valisto failed to report to a food service worker that Plaintiff's August 15 dinner did not comply with Plaintiff's Restricted Diet Order and that Defendant Urrea failed to report to a food service worker that Plaintiff's August 19 lunch was noncompliant. Plaintiff's allegations do not support a conclusion that either Defendant Valisto or Defendant Urrea was acting with deliberate indifference to Plaintiff's health or safety. Thus, the Court will dismiss without prejudice Plaintiff's claims against Defendants Valisto and Urrea.

**V.     Warnings**

**A.     Address Changes**

Plaintiff must file and serve a notice of a change of address in accordance with Rule 83.3(d) of the Local Rules of Civil Procedure. Plaintiff must not include a motion for other relief with a notice of change of address. Failure to comply may result in dismissal of this action.

**B.     Copies**

Plaintiff must serve Defendants, or counsel if an appearance has been entered, a copy of every document that he files. Fed. R. Civ. P. 5(a). Each filing must include a certificate stating that a copy of the filing was served. Fed. R. Civ. P. 5(d). Also, Plaintiff must submit an additional copy of every filing for use by the Court. *See* LRCiv 5.4. Failure to comply may result in the filing being stricken without further notice to Plaintiff.

**C.     Possible Dismissal**

If Plaintiff fails to timely comply with every provision of this Order, including these warnings, the Court may dismiss this action without further notice. *See Ferdik v. Bonzelet*, 963 F.2d 1258, 1260-61 (9th Cir. 1992) (a district court may dismiss an action for failure to comply with any order of the Court).

**IT IS ORDERED:**

(1)     Defendants Montaño, Merriman, Gaye, Muko, and Tuozzo must answer Count One of the First Amended Complaint.

(2) Count Two is **dismissed** without prejudice as duplicative.

(3) Defendants Trinity, Ryan, Jones, Valisto, Barr, Urrea, and Does I through XI are **dismissed** without prejudice.

(4) The Clerk of Court must send Plaintiff a service packet including the First Amended Complaint (Doc. 25), this Order, and both summons and request for waiver forms for Defendants Montaño, Merriman, Gaye, Muko, and Tuozzo.

(5) Plaintiff must complete[3] and return the service packet to the Clerk of Court within 21 days of the date of filing of this Order. The United States Marshal will not provide service of process if Plaintiff fails to comply with this Order.

(6) If Plaintiff does not either obtain a waiver of service of the summons or complete service of the Summons and First Amended Complaint on a Defendant within 90 days of the filing of the Complaint or within 60 days of the filing of this Order, whichever is later, the action may be dismissed as to each Defendant not served. Fed. R. Civ. P. 4(m); LRCiv 16.2(b)(2)(B)(ii).

(7) The United States Marshal must retain the Summons, a copy of the First Amended Complaint, and a copy of this Order for future use.

(8) The United States Marshal must notify Defendants of the commencement of this action and request waiver of service of the summons pursuant to Rule 4(d) of the Federal Rules of Civil Procedure. The notice to Defendants must include a copy of this Order.

(9) A Defendant who agrees to waive service of the Summons and First Amended Complaint must return the signed waiver forms to the United States Marshal, not the Plaintiff, **within 30 days of the date of the notice and request for waiver of service** pursuant to Federal Rule of Civil Procedure 4(d)(1)(F) to avoid being charged the cost of personal service.

---

[3] If a Defendant is an officer or employee of the Arizona Department of Corrections, Plaintiff must list the address of the specific institution where the officer or employee works. Service cannot be effected on an officer or employee at the Central Office of the Arizona Department of Corrections unless the officer or employee works there.

(10)   The Marshal must immediately file signed waivers of service of the summons. If a waiver of service of summons is returned as undeliverable or is not returned by a Defendant within 30 days from the date the request for waiver was sent by the Marshal, the Marshal must:

   (a)   personally serve copies of the Summons, First Amended Complaint, and this Order upon Defendant pursuant to Rule 4(e)(2) of the Federal Rules of Civil Procedure; and

   (b)   within 10 days after personal service is effected, file the return of service for Defendant, along with evidence of the attempt to secure a waiver of service of the summons and of the costs subsequently incurred in effecting service upon Defendant. The costs of service must be enumerated on the return of service form (USM-285) and must include the costs incurred by the Marshal for photocopying additional copies of the Summons, First Amended Complaint, or this Order and for preparing new process receipt and return forms (USM-285), if required. Costs of service will be taxed against the personally served Defendant pursuant to Rule 4(d)(2) of the Federal Rules of Civil Procedure, unless otherwise ordered by the Court.

(11)   Defendants Montaño, Merriman, Gaye, Muko, and Tuozzo must answer the relevant portions of Count One of the First Amended Complaint or otherwise respond by appropriate motion within the time provided by the applicable provisions of Rule 12(a) of the Federal Rules of Civil Procedure.

(12)   Any answer or response must state the specific Defendant by name on whose behalf it is filed. The Court may strike any answer, response, or other motion or paper that does not identify the specific Defendant by name on whose behalf it is filed.

. . . .

. . . .

. . . .

. . . .

TERMPSREF

(13)   This matter is referred to Magistrate Judge Camille D. Bibles pursuant to Rules 72.1 and 72.2 of the Local Rules of Civil Procedure for all pretrial proceedings as authorized under 28 U.S.C. § 636(b)(1).

Dated this 9th day of June, 2021.

_____
James A. Teilborg
Senior United States District Judge

TERMPSREF